```
        THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

                              CENTRAL DIVISION
```

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:07CR00182 DS |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | MEMORANDUM DECISION AND |
| ENRIQUE DIAZ-MEDINA, | ) | ORDER ADDRESSING MOTION |
| | | TO SUPPRESS EVIDENCE |
| Defendant. | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## I.   INTRODUCTION

Defendant Enrique Diaz-Medina has moved to suppress evidence or statements seized or obtained as a result of the alleged illegality of the vehicle stop, his detention and the search of the vehicle in which he was a passenger, and his subsequent questioning, beginning on March 8, 2008.

At approximately 7:30 a.m. on Thursday March 8, 2007, Trooper Nick Bowles of the Utah Highway Patrol stopped a car on I-70 in Sevier County, Utah for a window tint violation. As Trooper Bowles approached the passenger side of the car he observed an empty front passenger seat and a male occupant in the back seat. When the driver rolled down the window he detected the overwhelming odor of air freshener and saw at least three air fresheners in the car. He also noted that the ignition key ring held only one key. The

driver identified herself as Alma Acosta-Medina and produced an Arizona driver's license and her vehicle registration.

As is his practice, Trooper Bowles asked the driver to accompany him to his patrol car where, while writing the driver a warning citation for window-tint violation, he asked the driver about her traveling companion, her destination, and the purpose of her travel.  She identified the man in the back seat as her cousin, Enrique Diaz-Medina.  She said that she was traveling to Salt Lake City to visit another cousin, Eduardo, although she struggled to give a last name.  She was unable to provide a general destination in Salt Lake City.

When Trooper Bowles ran license, warrants and criminal history checks on the driver he discovered that she had been arrested previously for trafficking illegal aliens.  The driver also told Trooper Bowles that she owned the car and had paid $6,500. for it.  The vehicle registration showed the purchase price was $17,999.

When asked how long she planned on staying in Salt Lake, the driver responded that she planned on staying two or three days but had to be back to work in Phoenix on Saturday.  As the stop occurred on Thursday, she would have needed to leave Salt Lake City almost immediately to make it back to Phoenix and work by Saturday.

Trooper Bowles returned the driver's license and registration, along with a written warning citation.  Throughout the stop the driver's hands had been shaking and she appeared to Trooper Bowles to be unusually nervous, which increased as the stop progressed.  When the driver exited his patrol car, Trooper Bowles asked her if he could speak with her cousin, the passenger.  She assented and returned to the patrol car.

The conversation between Trooper Bowles and the passenger, Defendant Enrique Diaz-Medina, was conducted in mixed Spanish and English.  Defendant who stated that he had come from Mexico three days earlier, also said that he was going to Utah to visit his cousin, but he gave names different from the name the driver had provided.

Trooper Bowles returned to his patrol car and informed the driver that she was free to leave, but inquired if he could ask her more questions.  She agreed.  When asked, she denied that she was doing anything illegal or that she had illegal drugs in the car.  Trooper Bowles stated that after each question about drugs she looked away before answering.  He asked the driver for consent to search and she said yes.  He also asked Defendant for consent and he also said yes.

During the course of his search, Trooper Bowles noticed that several parts of the car appeared to have been taken apart and put back together. The carpet in the trunk had been glued down. Underneath the carpet was spray-painted paper which concealed a seam covered with a bonding agent. When he broke away some of the "bondo" he was able to observe a package. Looking underneath the car, he observed an aftermarket compartment above the rear axle in which he found four pounds of methamphetamine.

After his arrest, Defendant was interviewed by Trooper Rodney Elmer who had him read a waiver of Miranda rights form. When Defendant finished reading the form out loud, he said he did not know anything about it and had no guilt in this matter. Trooper Elmer told him that it was necessary to sign the rights waiver for the trooper to ask questions to confirm his innocence. When asked by defense counsel if he spoke Spanish, Trooper Elmer responded, "A little bit." On redirect examination, Trooper Elmer clarified that he spoke conversational Spanish.

## II.  DISCUSSION

### A.  Legality of Stop.

For the reasons stated by the United States in its pleading, the Court finds the traffic stop was valid and legal based on reasonable suspicion of a traffic or equipment violation.

**B. Detention of Defendant.**

Defendant's position is that the traffic stop was unnecessarily prolonged because Trooper Bowles engaged the driver in conversation of approximately two minutes duration before he called dispatch to check wants and warrants, and that this questioning extended the traffic stop without the driver's consent. "[D]efendant submits that there did not exist reasonable suspicion (1) to extend the stop to allow for questioning of the driver before contacting dispatch and (2) to permit further questioning and detention once her documents had been returned and she was purportedly free to leave." Mem. Supp. pp. 6-7.

As Defendant acknowledges, during a routine traffic stop, an officer may request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings. *Untied States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994). While officers may routinely inquire about travel plans, a traffic stop may not extend beyond the time reasonably necessary to effectuate its purpose. *Muehler v. Mena*, 544 U.S. 93, 101 (2005). An officer may ask questions unrelated to the reason for the stop as long as the questioning does not extend the length of the detention. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006). The officer may also expand the scope of the detention if he has an objectively reasonably and

articulable suspicion that criminal activity has occurred or is occurring, based on the totality of the circumstances. *Id*. at 1258-60.

Here, engaging the driver in two minutes of conversation while in the process of preparing and issuing a warning citation, but before contacting dispatch for wants and warrants, does not exceed the time "reasonably necessary" to effectuate the purpose of the stop. Although Trooper Bowles was to be expeditions in effectuating the purpose of the stop, he was not operating under a stop-watch. The lapse of two minutes under the factual circumstances presented is not unreasonable by any stretch of the Court's imagination. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006)(brief questioning by officer while writing a warning ticket did not appreciably lengthen detention and no Fourth Amendment violation occurred).

Once the warning citation was issued, Trooper Bowles, based on the totality of circumstances, had reasonable suspicion that criminal activity was occurring, thus justifying further detention. He smelled the overwhelming odor of air freshener and observed at least three air fresheners in the car. *See United States v. Salzano*, 158 F.3d 1107, 1117 (10th Cir. 1998)(Briscoe, J., dissenting)("[i]t was not unreasonable for the officer to believe

6

the pine or evergreen scent could be a masking odor intended to hide the odor of drugs"). He observed that the driver of the car was unusually nervous and her hands were shanking. *See United States v. Williams*, 271 F.3d 1262, 1268 (10th cir. 2001)(extreme nervousness given some weight). The driver stated that she was headed for Salt Lake City, but was on a route that is not commonly used to travel to Salt Lake City. *See United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)(inconsistent statements about destination may give rise to reasonable suspicion). The driver could not provide Trooper Bowles with the general area of her destination in Salt Lake City. She was stopped on Thursday and stated she needed to be back to work in Phoenix on Saturday. *See United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995)(lack of knowledge of final destination, and implausibility of reason for travel may create reasonable suspicion). Trooper Bowles also had information that the driver had a previous arrest for trafficking illegal aliens. *See United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994)(criminal history, although not enough to constitute reasonable suspicion on its own, may be considered with other factors that foster suspicion of criminal activity). When he initiated the stop, Trooper Bowles also noticed that the car key in the ignition was the only key on the chain. *See United States v. Guerrero*, 472 F.3d 784 (10th Cir. 2007)("lone key on a single ring similarly indicated, however weakly, that this was not a car that

Mr. Guerrero drove regularly"). The driver also told the officer she had paid $6,500 for the car, although the registration indicated that the purchase price was $17,999 which could suggest the car was provided to her by a third party.

Defendant's reliance on *United States v. Kaguras*, 183 Fed. Appx. 783 (10th Cir. 2006), is distinguishable from the present factual situation and is rejected. The *Kaguras* Court rejected the officer's claim that the driver was suspiciously nervous as contrary to videotape and transcript evidence. Other factors considered in that case by the officer as suggesting suspicious activity, such as the amount and size of luggage, use of a rental car, the presence of a food wrapper in the car, and the scent of air fresheners without testimony of their actual presence in the vehicle, are not at issue here.

**C.   Knowingly and Intelligently Waiver of Miranda Rights.**

Defendant also urges that statements obtained from him by troopers are not admissible because he did not knowingly and voluntarily waive his Miranda rights. "The principal flaw with the waiver was that the trooper explained to [Defendant] that it was necessary to sign the waiver so the trooper could confirm his innocence. Such a statement could be construed as a deceptive

8

practice to get the defendant to make a statement ."  Mem. Opp'n pp. 7-8.

The Court disagrees.  There is no evidence to support such a supposition.  The simple facts before the Court are that Trooper Elmer had Defendant read aloud  a waiver of Miranda rights form.  Defendant read the waiver aloud without any trouble.  After Defendant read the form, he immediately said that he had no guilt or fault in what was happening.  He proclaimed his innocence.  Trooper Elmer, who described his Spanish as conversational, testified "I told [Defendant] that for me to confirm his innocence that I would need him to talk to me at that time so that I could get things straighted [sic] out, and that I wouldn't be able to ask him questions without the waiver of rights."  Tr. 78.  Trooper Elmer also testified that the reason he used the word innocence was that Defendant used the word first.  After Trooper Elmer explained, that for him to question Defendant further Defendant would need to waive his rights, Defendant signed the form.  There is no evidence that Defendant was threatened or coerced in any way to waive his rights.

### III. CONCLUSION

For the reasons set forth as well as generally for those stated by the United States, Mr. Diaz-Medina's Motion to Suppress is denied.

IT IS SO ORDERED.

DATED this 8th day of November, 2007.

BY THE COURT:

*[signature: David Sam]*

DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT